**In the United States District Court
for the District of Kansas**

───────────────

Case No. 22-cv-02429-TC-GEB

───────────────

KAYLA JOHNSON,
KARA CARRIKER,

*Plaintiffs*

v.

CITY OF WICHITA,
LEE FROESE,

*Defendants*

───────────────

**MEMORANDUM AND ORDER**

Kayla Johnson and Kara Carriker are suing the City of Wichita and former Wichita Police Officer Lee Froese for a series of constitutional rights violations under Section 1983 and a series of torts under the Kansas Tort Claims Act (KTCA), K.S.A. § 75-6101 *et seq*. Defendants move to dismiss all claims against them under Fed. R. Civ. P. 12(b)(6). Doc. 9. For the following reasons, Defendants' motion is granted in part and denied in part.

**I**

**A**

To survive a motion to dismiss for failure to state a claim, the complaint need only contain "a short and plain statement … showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two "working principles" underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, a court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Penn Gaming*, 656 F.3d at 1214. Second, a court accepts as true all re-

1

maining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts, viewed in the light most favorable to the claimant, must move the claim from conceivable to plausible. *Id.* at 678–80. The "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). In other words, the nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

**B**

Plaintiffs Kayla Johnson and Kara Carriker were involved in an auto accident on September 26, 2019, in which Johnson's 8-year-old daughter, Kiya, was killed. Doc. 1 at 3, ¶ 1. Defendant Lee Froese was the responding Wichita police officer who investigated the accident. Doc. 1 at 3, ¶¶ 2, 8.[1]

During the investigation, Froese seized Plaintiffs' property, including a phone and Kiya's necklace. Doc. 1 at 3, ¶ 5. Their car was also impounded. Doc. 1 at 3, ¶ 6. Plaintiffs allege Froese seized their property without "probable cause." Doc. 1 at ¶ 38.[2]

---

[1] All citations are to the document and page number assigned in the CM/ECF system.

[2] Defendants claim the seizure was justified because Johnson "showed signs of marijuana use" and told Froese that she turned left in front of "oncoming traffic." Doc. 13 at 1. That argument will not be considered because

The City of Wichita stores evidence in the "Rounds and Porter Building" at or near 301 W. Central in Wichita, Kansas. Doc. 1 at ¶ 9. Plaintiffs received a "Find My Phone" notification indicating the seized phone was located at 301 W. Central. Doc. 1 at ¶ 10.

When Plaintiffs initially requested the return of their items, the City informed them that there was a pending criminal investigation regarding the collision. Doc. 1 at ¶ 12. Then, in December 2021, the City informed them that it did not have Plaintiffs' property. Doc. 1 at ¶ 14.

The City sold Plaintiffs' impounded car "without giving her" notice of the sale or informing her "that it was even available to be retrieved." Doc. 1 at 3, ¶ 6. And Plaintiffs allege Froese either lost or intentionally destroyed Plaintiffs' other property, including a cell phone with the "last known pictures and video taken of Kiya the day she died." Doc. 1 at 1, 3 ¶ 8. Losing Kiya's last known pictures and video, as well as her necklace, caused Johnson to suffer "hives, nausea, vomiting, headaches and other physical manifestations of [] emotional trauma." Doc. 1 at 4, ¶ 11.

Plaintiffs allege the intentional destruction of their property was retaliatory. Doc. 1 at ¶ 44. Plaintiffs' mother is a prominent "local activist who has criticized the Wichita Police Department." Doc. 1 at 1. After learning of the collision, she arrived at the scene. Doc. 1 at 3, ¶ 3. Once there, Froese allegedly recognized her as an activist critical of Wichita police, motivating him to seize and later destroy or intentionally lose Plaintiffs' property. Doc. 1 at 3, ¶ 44.

Plaintiffs also allege that the City is not "following its own regulations in storing" and maintaining evidence. Doc. 1 at 5, ¶ 21. They claim the City did not have a missing evidence policy prior to September 2022, and that the City and its employees knew or should have known that a lack of security, proper controls, proper staffing, and failure to update or create policies and procedures would deprive citizens of their constitutional rights. Doc. 1 at ¶¶ 22, 24–27. Specifically, the City Manager admitted that there was an "unacceptable delay" in solving the City's evidence problems, partially due to deficient

---

there are no facts in the complaint that suggest criminal activity contributed to the accident. *See Merswin v. Williams Companies, Inc.*, 364 F. App'x 438, 441 (10th Cir. 2010).

3

"barcoding practices," which in turn led to items used for investigations not being "properly recorded and tracked." Doc. 1 at ¶¶ 31–33.

Plaintiffs assert two varieties of claims in this lawsuit. First, Plaintiffs raise four constitutional claims via Section 1983: Fourth Amendment unreasonable seizure claims against both the City and Froese, Doc. 1 at ¶¶ 34–40, 51–55, a First Amendment retaliation claim against Froese alone, *id.* at ¶ 41–45, and a procedural due process claim against the City, *id.* at ¶¶ 46–50.

Second, Plaintiffs assert three state-law tort claims. Specifically, they allege both the City and Froese intentionally inflicted emotional distress, *id.* at ¶¶ 56–60, negligently inflicted emotional distress, *id.* at ¶¶ 61–65, and converted their property, *id.* at ¶¶ 66–68.

## II

Defendants have moved to dismiss all claims that Plaintiffs have lodged against them. For the following reasons, that motion is granted in part and denied in part.

### A

Regarding the constitutional claims, Defendants' motion to dismiss is granted in part and denied in part. The complaint plausibly alleges facts which amount to a violation of the Fourteenth Amendment. But Johnson and Carriker fail to allege facts showing that their retaliation claim against Froese implicates conduct which would violate clearly established law. And their claim for unreasonable seizure against Froese and the City does not state facts showing a plausible violation of the Fourth Amendment. Thus, those claims are dismissed.

#### 1

Section 1983 provides that "[e]very person who, under color of [state law,] subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. It creates no substantive rights but merely provides a mechanism for enforcing a right conferred by the Constitution or a federal statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 174–75 (2023).

4

To state a viable Section 1983 claim, a plaintiff must establish that a person acting under color of state law caused him or her to be deprived of a right secured by the Constitution or laws of the United States. *See Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)); *Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006).

Defendants contend that Plaintiffs failed to state any viable constitutional claim. Doc. 10 at 6–10. And Officer Froese asserts that he is entitled to qualified immunity. Doc. 10 at 7.

Qualified immunity as a doctrine attempts to balance competing interests. Suits against government actors allow those wronged by government misconduct a method of redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). But non-meritorious suits exact a high cost from society and government officials by unduly interfering with the discharge of official duties. *See id.*; *see also Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277 (10th Cir. 1998). So government officials performing discretionary duties are immune from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (recognizing municipalities may not rely on their officers' entitlement to qualified immunity). Whether an official is immune turns on the objective reasonableness of the official's actions, considering the laws clearly established at the time the official acted. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Objective reasonableness is not an exacting standard; qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *See White v. Pauly*, 580 U.S. 73, 79 (2017); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The analytical framework for Froese's invocation of qualified immunity at the Rule 12 stage is straightforward. First, the facts as pled in the complaint must allege conduct that, assuming the allegations are true, violates the Constitution or laws of the United States. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Second, the law must have been clearly established at the time of the alleged conduct such that the defendant had fair notice that his or her conduct was unlawful. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). If both inquiries are answered in the affirmative, the motion to dismiss must be denied. But, if the answer to either is no, the defendant is entitled

to judgment as a matter of law. *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023). Courts have discretion to address the inquiries in any order, as courts must "think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" *al-Kidd*, 563 U.S. at 735 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Discerning whether the relevant legal rule was clearly established is a narrow and context-specific exercise. *See Anderson*, 483 U.S. at 639; *White v. Pauly*, 580 U.S. at 79. The precise contours of the legal right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct in the particular situation. *See Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5-8 (2021) (reversing a denial of qualified immunity where the precedent relied upon had "materially distinguishable" facts such that it "did not give fair notice" to the official). Practically, this means a "Supreme Court or Tenth Circuit decision" must have held that the same conduct (or very nearly the same conduct) as the conduct at issue is a violation of law.[3] *Wise v. Caffey*, 72 F.4th 1199, 1209 (10th Cir. 2023). When it is debatable whether a violation has occurred in the circumstances at issue, the law cannot, by definition, be clearly established. *See Reichle*, 566 U.S. at 669–70; *City of Tahlequah v. Bond*,

---

[3] The Supreme Court has never held that circuit precedent may be a dispositive source of clearly established law, opting instead to assume without deciding that it might. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015), which cited *Carroll v. Carman*, 574 U.S. 13, 17 (2014), which, in turn, cited *Reichle*, 566 U.S. at 665-66). That reticence may be attributable to the peculiar situation that could arise if a constitutional right is found to be clearly established in the Tenth Circuit (which would include Kansas City, Kansas) but not in the Eighth Circuit (which would include Kansas City, Missouri). *Cf. Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). Nonetheless, the law in the Tenth Circuit is clear: a "constitutional right is clearly established when a Tenth Circuit precedent is on point, making the constitutional violation apparent." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017).

595 U.S. 9, 12 (2021) (reversing the denial of qualified immunity where the precedent did not make it clear to an officer that the specific conduct at issue was unlawful).

**2**

Plaintiffs allege three constitutional claims. They have pled a viable Fourteenth Amendment claim against the City. But they fail to plead a viable claim against either defendant on First or Fourth Amendment grounds.

**a.** Plaintiffs allege that the City violated their Fourteenth Amendment rights to procedural due process.[4] *See Mathews v. Eldridge*, 424 U.S. 319 (1976). In particular, Plaintiffs allege that the City's "policies and procedures, or lack thereof, for the storage and release/purge of evidence is [sic] unconstitutional and violates the 14th Amendment" because the City's acts deprive "citizens of property without due process of law." Doc. 1 at ¶¶ 48–49.

A procedural due process claim requires a two-step inquiry. *See generally Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011). Plaintiffs must first allege that they possessed a protected interest in life, liberty, or property that the government took. *Id.* And if they do, they must allege that they were denied the appropriate level of process. *Id.* For example, before the government disposes of or otherwise encumbers a person's property, it must provide notice "reasonably calculated" to apprise the parties of the disposition and afford them "an opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006).

Plaintiffs (one, the other, or both) have alleged they possessed a protected property interest in the car, phone, and necklace that the City took. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571–72 (1972) ("The Court has also made clear that

---

[4] Plaintiffs do not state which Plaintiff had ownership rights in the seized property. As a result, it is unclear which Plaintiff has standing to pursue claims related to its sale, loss, or destruction. But since at least one Plaintiff does according to the allegations, the claims can go forward at this early stage of litigation. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint").

7

the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money."). Plaintiffs also have alleged that they failed to receive any notice or an opportunity to recover their property before the City destroyed or disposed of it. Doc. 1 at 3, ¶¶ 6, 18 (alleging that the City sold Plaintiffs' car without notice and that the City "has had an ongoing problem with seizing and then losing evidence"). Their allegations state an adequate interference with protected property interests. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("the general rule [is] that individuals must receive notice and an opportunity to be heard before the Government deprives them of property").

The availability of post-deprivation process does not preclude Plaintiffs' claim. *Contra* Doc. 10 at 9. Post-deprivation process, including state tort remedies, can satisfy due process in some cases. But it does so only when the deprivation was random and unauthorized. In those cases, a deprivation could not have been predicted in advance and prevented with pre-deprivation procedural safeguards. *See Parratt v. Taylor*, 451 U.S. 527, 535–44 (1981); *see also Becker v. Kroll*, 494 F.3d 904, 921 (10th Cir. 2007). Plaintiffs' complaint, however, alleges the loss of property was anything but unanticipated. To the contrary, they allege the deprivation was the product of either intentional and/or programmatic conduct that the City knew or should have known was insufficient to prevent unintended deprivations. Doc. 1 at ¶ 49. Under these circumstances, pre-deprivation process was required. *See Zinermon v. Burch*, 494 U.S. 113, 135–37 (1990) (finding that hospital staff who followed a concrete, state-created procedure did not act randomly or without authorization); *see also Kan. Motorcycle Works U.S., LLC v. McCloud*, 569 F. Supp. 3d 1112, 1124 (D. Kan. 2021) (reviewing Tenth Circuit precedent applying the *Zinermon* principle); *cf. Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (noting that pre-deprivation process was impossible).[5]

---

[5] The City, over Plaintiffs' objection, asks that the City's policies be considered in resolving its motion to dismiss. Doc. 10 at 4-5 (requesting consideration of additional facts as to the City's policies of evidence collection and disposal). That request is denied because Plaintiffs did not have access to those policies, do not accept the authenticity of the policies the City offers, *see* Doc. 12 at 8, and their complaint did not specifically reference the policies defendants attached. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

**b.** Plaintiffs allege Froese retaliated against them for engaging in conduct protected by the First Amendment. But Froese is entitled to qualified immunity because they do not allege a violation of clearly established law. *See Reichle v. Howards*, 566 U.S. 658, 663, 670 (2012) (concluding that officers were entitled to qualified immunity after considering only the "clearly established" prong of that analysis); *cf. City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) (focusing on only the clearly established prong because the constitutional question had not been adequately briefed).

A plaintiff usually must allege three things in a First Amendment retaliation claim. *Irizarry v. Yehia*, 38 F.4th 1282, 1288 (10th Cir. 2022). He or she must have engaged in constitutionally protected activity. *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1148 (10th Cir. 2020). That activity must have substantially motivated the defendant to injure the plaintiff. *Id.* And the injury must be serious enough to chill a person of ordinary firmness from continuing their protected activity. *Id.* Plaintiffs allege that Froese decided to destroy or lose their property because they associated with their mother, someone he allegedly knew to have criticized the Wichita Police Department. Doc. 1 at 1, 7.

Plaintiffs' theory has at least two problems that the parties' briefing fails to adequately explore. One is that the parties fail to cite any law suggesting that bare familial association—that is, being the children of a critic—constitutes engaging in protected conduct in a way that would support a retaliation claim. *See generally Nielander v. Board of County Comm'rs of Republic County*, 582 F.3d 1155, 1165 (10th Cir. 2009) (recognizing that engaging in protected activity is required to support a retaliation claim). After all, if that were enough, Plaintiffs' theory would presumably permit a retaliation claim any time a close family member of a government critic had an unfavorable interaction with the police.

Another is that the complaint fails to clarify what Froese did with the items that were destroyed. It alleges the destruction occurred years after the initial seizure, but there is a lack of clarity as to what Froese did that may have caused the ultimate destruction. *But see, e.g., Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (recognizing the need to establish the defendant personally participated in the constitutional deprivation). These are important and undeveloped issues that significantly impact the determination of whether Plaintiffs pled a plausible constitutional violation.

9

These problems implicate the concerns motivating the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In *Pearson*, the Court held that lower courts have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* Choosing the second path may be appropriate, the Court noted, when "the precise factual basis for the plaintiff's claim or claims [are] hard to identify," and the parties' briefs on the constitutional issues do not provide the clarity needed to resolve difficult issues of constitutional law. *Id.* at 238–39. That state of affairs raises the possibility of divining what the claim is (or is not) and then rendering a constitutional decision that is "an essentially academic exercise" because relevant precedent occupying the landscape settled nothing at the time of the act in question. *Id.* at 237.

When considering the second prong, it is plain to see that Froese is entitled to qualified immunity because Plaintiffs have failed to identify any case that clearly establishes a constitutional violation in like circumstances. Put simply, none of the cases they cited are citizen-police encounters where the retaliatory conduct was motivated by a passive familial relationship. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008), for example, is substantively and procedurally inapposite. *Contra* Doc. 12 at 6-7. In that case, the claim involved an officer who allegedly ordered the use of force against the plaintiff who was then engaging in expressive conduct in the officer's presence. *Id.* at 1292–93. Even so, the Tenth Circuit did not consider the parties' arguments because it had no jurisdiction over the interlocutory appeal focused on the district court's resolution of disputes concerning the material facts. *Id.* In other words, *Buck* failed to provide Froese with any guidance as to how he should handle the encounter with the children of a government critic.

Plaintiffs' other Supreme Court and Tenth Circuit cases are even farther afield. They arise from distinct facts and their holdings—at best—support only the general concept that retaliation can be actionable under the First Amendment. *See Crawford-El v. Britton*, 523 U.S. 574 (1998) (holding that Section 1983 plaintiffs need not show improper motive by clear and convincing evidence); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 572–75 (1968) (recognizing that firing a teacher for engaging in speech on a matter of public concern violates the First Amendment); *Worrell v. Henry*, 219 F.3d 1197, 1212-13 (10th Cir. 2000) (holding it was clearly established that

an employer could not retaliate against an employee who testified truthfully in a trial).

The context of this dispute—a citizen-police encounter at the scene of an accident involving the children of a government critic—likewise distinguishes the prisoner cases that Plaintiffs cite. *Contra* Doc. 12 at 8. In both cases, prison officials subjected prisoners to adverse action in direct retaliation for the prisoner's protected conduct. *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (prisoner disciplined because he accessed the courts); *Fogle v. Pierson*, 435 F.3d 1252, 1263 (10th Cir. 2006) (prisoner transferred because he complained about administrative segregation). In each case, the defendant allegedly punished the prisoner for his own expression. But those cases give no guidance in a case involving no direct activity and instead only alleging indirect adverse action based on a familial association.

Plaintiffs cannot be faulted for failing to cite authority in support of their theory because retaliation case law appears to have developed only in distinguishable factual situations where plaintiffs actively engaged in protected conduct and suffered adverse action directly triggered by such conduct.[6] In *Lozman v. Riviera Beach*, for example, the City of Riviera Beach allegedly maintained an official and premeditated policy of retaliation whereby the City Council planned to arrest Lozman should he speak at its meeting. *See* 138 S. Ct. 1945, 1954 (2018) (noting that "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation"). In other words, there was an obvious causal chain between Mr. Lozman's protected conduct and the intentional and retaliatory actions taken against him. Plaintiffs' complaint lacks that connection: There is no allegation here that Froese was waiting for an opportunity to destroy the lawfully seized property of family members of Plaintiffs' mother. It instead alleges that his desire to retaliate arose at the scene of the motor vehicle accident that he happened to work based on prior (and unspecified) conduct attributable to Plaintiffs' mother.

Likewise, many (though certainly not all) cases upholding claims for retaliation deal with retaliation against government employees

---

[6] The qualified immunity inquiry requires federal courts to not only consider those cases the parties have cited, but to more generally review the state of existing precedent. *See Elder v. Holloway*, 510 U.S. 510, 516 (1994).

11

whose speech and associational rights are different from those of regular citizens. *See, e.g.*, *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1079 (10th Cir. 2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Government employment is a different context that necessarily has different rules. When case law applied in one constitutional context must be extended to and applied in another context to demonstrate a violation, the law is not clearly established. *Cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867–69 (2017) (declining to find a violation clearly established when it would require extending existing *Bivens* case law to a "new context").

The facts pled in this case demonstrate how this context is different. Plaintiffs' mother is alleged to be an outspoken critic of the police, but Plaintiffs say nothing similar about themselves engaging in such conduct. The only associational conduct they identify is biological. This passive associational conduct is important because most (if not all) associational retaliation cases focus on whether the object of the retaliation would suffer a harm sufficient to punish them for past associations or deter them from future associations. *See, e.g.*, *Perez v. Ellington*, 421 F.3d 1128 (10th Cir. 2005) (the tribe stated a retaliatory association claim because the state's quick decisions issuing jeopardy tax assessments could chill a person of ordinary firmness from associating with a disfavored non-tribal member). But here there is no associational conduct of Plaintiffs that could be chilled; they are and will remain the children of their mother. *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (recognizing that mere "interaction" is not expressive association).

*Heffernan v. City of Paterson* provides yet another instructive comparison to Plaintiffs' claims. 578 U.S. 266 (2016). In *Heffernan*, a police officer was demoted because he held a yard sign for a political candidate his superiors disfavored. *See* 578 U.S. 266, 269 (2016). In actuality, the yard sign was for Heffernan's mother and Heffernan did not support the candidate. Unlike Heffernan, Plaintiffs are not alleging they were engaged in any expressive conduct or even that they were wrongly accused of engaging in protected expressive conduct at the scene of the accident. Instead, they allege only that they were targeted because their mother had previously engaged in expressive conduct and police knew them to be related to their mother.

Plaintiffs' unique circumstances also affect the questions of causation and inference of retaliatory motive. In a First Amendment retaliation claim, a plaintiff must allege that their protected activity

"substantially motivated" the defendant's actions. *Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223, 1232 (10th Cir. 2022). And non-retaliatory grounds must be insufficient to provoke the adverse consequences. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Taking the complaint and its allegations as a whole, it is hard to say with any degree of confidence that the adverse action would not have occurred but for Froese's allegedly retaliatory motive. In fact, several allegations in the complaint strongly suggest that the necklace and phone were likely lost in the years-long morass of the Wichita Police's evidence department regardless of Froese's on-the-scene retaliatory motives.

At a high level, it may seem obvious that the First Amendment should preclude an officer from retaliating against someone because they engaged in protected associational conduct. But qualified immunity cannot be defined at such a high level. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Froese is entitled to qualified immunity in this case because there appears to be no binding or persuasive authority recognizing that his conduct in this situation is unlawful, much less clearly so.

**c.** Plaintiffs assert a Fourth Amendment claim against the City and Froese based on Froese's seizure of a phone and a necklace at the scene of the motor vehicle accident. That claim fails because Plaintiffs do not plead facts that plausibly suggest a Fourth Amendment violation.[7] In addition, Froese is entitled to qualified immunity.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Seizures are presumed unreasonable when conducted without a valid warrant. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61–65 (1992); *see also Horton v. California*, 496 U.S. 128, 110 (1990); *United States v. Karo*, 468 U.S. 705, 717 (1984). But the Supreme Court has held that when there is probable cause to believe "that [a] vehicle itself" is contraband under state law, law enforcement may seize the vehicle from a public place without a warrant. *Florida v. White*, 526 U.S. 559, 564 (1999); *see also G.M. Leasing*

---

[7] The conclusion that Froese's conduct did not constitute a constitutional violation precludes liability as against the City. *Trigalet v. City of Tulsa, Oklahoma*, 239 F.3d 1150 (10th Cir. 2001).

*Corp. v. United States*, 429 U.S. 338 (1977). Doing so neither infringes on a reasonable expectation of privacy nor trespasses on a constitutionally protected space. *Florida v. White*, 526 U.S. at 564. Officers may also seize vehicles when executing "the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic." *United States v. Sanders*, 796 F.3d 1241, 1245 (10th Cir. 2015).

The seizure of Plaintiffs' vehicle and its contents did not violate the Fourth Amendment because on the facts alleged here law enforcement had a legitimate reason to seize the damaged vehicle. Plaintiffs were involved in a car crash that occurred in the Wichita police's jurisdiction. *See* Doc. 1 at 1, 3; *see also* Doc. 12 at 4, Doc. 13 at 1. And there is no allegation that the purpose of investigating the "collision" or of impounding the vehicle was to conduct a warrantless investigation of Plaintiffs. *See* Doc. 1 ¶¶ 2–6. Impounding a car involved in an accident to further investigate the accident, facilitate the flow of traffic, and promote public safety is constitutional so long as the car is in a public place and the police apply standardized procedures and criteria to determine which cars are a hazard to public safety. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (removing cars impeding public safety or convenience is routine police work); *see also Sanders*, 796 F.3d at 1245. The same principle permits police to seize and inventory the contents of a validly impounded car—here, the cell phone and necklace. *United States v. Chavez*, 985 F.3d 1234, 1242 (10th Cir. 2021) (affirming that when police have "temporary custody" of a vehicle, a "warrantless inventory search" pursuant to "standard police procedures" does not violate the Fourth Amendment).

Plaintiffs' contrary argument—that they were never charged with a crime—does not vitiate the existence of a legitimate reason to seize the vehicle. *Contra* Doc. 1 at ¶ 13, 38. While the presence of criminal charges can support the inference that probable cause existed, the absence of a criminal charge is insufficient to infer that a predicate seizure was without probable cause. *See Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223, 1233 (10th Cir. 2022). That does not mean, as Plaintiffs allege, that they are required to prove a negative. *Contra* Doc. 12 at 3. To the contrary, they must allege facts that nudge their assertion that there was no probable cause (a bare legal conclusion) over the line from possible to plausible, and they fail to do so. *See Iqbal*, 556 U.S. at 678 (allegations that are "merely consistent with" a defend-

14

ant's liability cannot survive a motion to dismiss). The facts alleged suggest that Froese had authority to seize the damaged vehicle and inventory its contents in order investigate the circumstances of the traffic accident and to promote public safety by removing the vehicle from the road. That does not offend the Constitution.[8] *See Opperman*, 428 U.S. at 368 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge"); *United States v. Woodard*, 5 F.4th 1148, 1150 (10th Cir. 2021) (reiterating the public safety exception); *United States v. Trujillo*, 993 F.3d 859, 864 (10th Cir. 2021) (noting that some impoundments are valid even if they do not squarely address *Opperman*'s community-caretaking rationale).

**B**

That leaves Plaintiffs' state-law tort claims. Defendants' motion to dismiss is again granted in part and denied in part. Plaintiffs state a claim for conversion but fail to allege facts which would support claims for intentional infliction of emotional distress or negligent infliction of emotional distress.

The Kansas Tort Claims Act governs the state-law tort claims against the City of Wichita and Officer Froese as well as the relevant immunities. In general, the Act makes "cities, counties, and the state" liable when their employees act negligently or wrongfully under the doctrine of respondeat superior and renders government employees liable for money damages when they commit unprivileged torts within the scope of employment. *Schreiner v. Hodge*, 504 P.3d 410, 422 (Kan. 2022) (explaining how Kansas has partly abrogated common-law governmental immunity through the Act). "[It] is an 'open ended' act, meaning that liability is the rule and immunity is the exception." *Soto v. City of Bonner Springs*, 238 P.3d 278, 282 (Kan. 2010).

But there are many statutory exceptions to the Act's waiver of governmental immunity. *See* Kan. Stat. Ann. § 75-6104. These include damages resulting from enforcing or failing to enforce the law, K.S.A.

---

[8] And, even if it did, Plaintiffs have not identified any law that clearly established Froese's conduct was unlawful. *See United States v. Trujillo*, 993 F.3d 859, 870 (10th Cir. 2021) (discussing the myriad instances where the Tenth Circuit has found impounding a vehicle to be a reasonable exercise of police judgment).

15

§ 75-6104(a)(3), damages resulting from a claim based on the exercise of or failure to exercise a discretionary function, K.S.A. § 75-6104(a)(5), and the failure to provide, or the method of providing, police or fire protection, K.S.A. § 75-6104(a)(14). Immunity under the Act can defeat a claim at the motion to dismiss stage, but the governmental entity must prove that it is immune. *Keiswetter v. State*, 373 P.3d 803, 807 (Kan. 2016); *see also Beck v. Kansas Adult Authority*, 735 P.2d 222 (Kan. 1987) (granting a motion to dismiss on the grounds that the police protection exception applied).

### 1

Plaintiffs adequately plead the elements of conversion and Defendants have not established that they are immune. Accordingly, Plaintiff's conversion claim is sufficiently stated to survive the motion to dismiss stage.

Kansas defines conversion as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Moore v. State Bank of Burden*, 729 P.2d 1205, 1210 (Kan. 1986); *see also Muhl v. Bohi*, 152 P.3d 93, 101 (Kan. Ct. App. 2007). "A conversion occurs when there is an intentional exercise of dominion and control over a property interest that interferes with the right of another to control the property interest and results in damages to the owner of the property interest." *Scholfield Bros. v. State Farm Mut. Auto. Ins. Co.*, 752 P.2d 661, 662 (Kan. 1988) (*citing Nelson v. Hy–Grade Construction & Materials, Inc.*, 527 P.2d 1059 (Kan. 1974) and Restatement (Second) of Torts § 222A (1964)).

Plaintiffs' complaint, taken as true, pleads textbook conversion. They allege Froese and the City took intentional possession of Plaintiffs' property through seizure. The property has since been lost, sold, or destroyed, without the privilege to do so, at least according to Plaintiffs, such that Plaintiffs are permanently deprived of their property leading to damages. These allegations, taken as true, state a viable claim for conversion. *See Nelson v. Hy-Grade Const. & Materials, Inc.*, 527 P.2d 1059, 1062 (Kan. 1974) (summarizing a valid conversion claim).

Bailment law does not compel a different result. *Contra* Doc. 10 at 15. Generally, a bailee lawfully holding property for another only becomes liable for conversion once the property must be returned.

*Queen v. Lynch Jewelers, LLC*, 55 P.3d 914, 922 (Kan. Ct. App. 2002). Law enforcement holding property for the purposes of investigation are in the position of a bailee. *See Moulden v. Hundley*, 404 P.3d 690, 695 (Kan. Ct. App. 2017). Plaintiffs have pled that there is no longer an ongoing investigation and, as a result, that their property must be returned. *See* Doc. 1 at ¶¶ 12–14. In essence, while the original seizure may have been privileged conduct, the permanent deprivation of the property after the right to possess it has ceased transforms the bailment into a conversion. *Schoenholz v. Hinzman*, 289 P.3d 1155, 1161 (Kan. 2012) ("When a bailee makes an unauthorized disposition of the bailor's property, the bailor may have a cause of action for conversion."). And permanent deprivation is exactly what is alleged here.

Defendants raise two further arguments. Neither is persuasive at this stage.

First, Defendants have not carried their burden to show that the conduct alleged here was covered by the police protection immunity. *Contra* Doc. 10 at 14–15. K.S.A. § 75-6104(a)(14) provides Kansas and local governmental entities immunity from liability for the "failure to provide, or the method of providing, police or fire protection."[9] Thus "systemic or policy decisions" such as how many police officers to assign to a neighborhood, or "operational or tactical decisions made in the field" cannot give rise to liability. *Est. of Randolph v. City of Wichita*, 459 P.3d 802, 820 (Kan. Ct. App. 2020). But the privilege does not apply to "intentional acts that are tortious." *Id.* (citing *Beck v. Kansas Adult Authority*, 735 P.2d 222 (Kan. 1987)). In this case, the allegation is that Froese committed conversion, an intentional tort, and so the privilege does not apply to either Froese's liability or the City's derivative vicarious liability for Froese's alleged tort. *Cf. Caplinger v. Carter*, 676 P.2d 1300, 1307 (Kan. Ct. App. 1984) ("[I]t is difficult to conceive the idea that an intentional beating involves any kind of discretion."); *see also Tran v. City of Lawrence*, 653 F. Supp. 3d 894, 909 (D. Kan. 2023) (finding that the Kansas Tort Claims Act does not protect against battery allegations).

Second, the contention that the conversion claims are not plausible given the possibility the City was merely negligent is unpersuasive.

---

[9] Defendants refer to K.S.A. § 75-6104(n) in their brief, *see* Doc. 10 at 12, but the language they cite appears in the current statutory compilation as K.S.A. § 75-6104(a)(14).

*Contra* Doc. 10 at 15. Even assuming that the complaint only plausibly alleged that the property was lost pursuant to poor recordkeeping and evidence storage practices, the conversion claim is still viable. Under Kansas law, the City can be held liable if it knew about such practices and did nothing to prevent the harm. *Cf. Schoenholz v. Hinzman*, 289 P.3d 1155, 1161 (Kan. 2012) (noting that "when a bailee converts property under his or her care, the bailee is answerable for the conversion, no matter how good his intentions or how careful he has been"). The allegations support that possibility. Doc. 1 at ¶¶ 21–33. And lack of specific intent to convert property is no defense to the tort of conversion. *Snider v. MidFirst Bank*, 211 P.3d 179, 183 (Kan. Ct. App. 2009) ("The required intent is shown by the use or disposition of property belonging to another"); *see also Speer v. City of Dodge City*, 636 P.2d 178, 180 (Kan. Ct. App. 1981).

**2**

Plaintiffs do not plead plausible claims for intentional infliction of emotional distress and negligent infliction of emotional distress. As a result, those claims must be dismissed.

**a.** Plaintiffs allege intentional infliction of emotional distress. Kansas law requires such a plaintiff allege intentional or reckless conduct that is also extreme and outrageous. *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010). And the plaintiff must allege that the conduct caused the plaintiff's extreme and severe distress. *Id.* These requirements set a high bar. Otherwise, "the doors of the courts are opened wide, not only to fictitious claims, but to litigation in the field of trivialities and mere bad manners." *Roberts v. Saylor*, 637 P.2d 1175, 1178 (Kan. 1981).

Plaintiffs fail to state a claim for intentional infliction of emotional distress because they do not allege that they suffered extreme and severe emotional distress. Extreme and severe emotional distress is more than embarrassment, nervousness, or fright. *Roberts v. Saylor*, 637 P.2d 1175 (Kan. 1981). Qualifying distress must be of "such [an] extreme degree [that] […] no reasonable person should be expected to endure it." *Valadez*, 229 P.3d at 394. Physical symptoms are more likely to suffice than intangible injuries, but such symptoms must "be long lasting and debilitating." *Valadez*, 229 P.3d at 395. Neither Plaintiff pleads sufficient distress. Carriker alleges no symptoms of distress at all. And Johnson alleges only that she suffered from "hives, nausea, vomiting, [and] headaches." Doc. 1 at ¶ 11. She does not allege

that these symptoms were so long lasting and debilitating that no reasonable person, including Johnson, should be expected to endure them. *See Valadez*, 229 P.3d at 394 (explaining that a lack of medical or psychiatric treatment suggests the distress is not severe enough).

**b.** Plaintiffs also assert a claim for negligent infliction of emotional distress against the City and Froese. That claim fails for similar reasons. In Kansas, negligent infliction of emotional distress is confined to a narrow range of circumstances. It requires a negligent act that causes emotional distress which results in "physical impact," meaning "substantially simultaneous" qualifying physical injuries. *Hoard v. Shawnee Mission Med. Ctr.*, 662 P.2d 1214, 1220 (Kan. 1983); *see also Ware ex rel. Ware v. ANW Special Educ. Co-op. No. 603*, 180 P.3d 610, 613 (Kan. Ct. App. 2008). General non-physical suffering and associated negative consequences do not count. *Anderson v. Scheffler*, 752 P.2d 667, 669 (Kan. 1988); *Majors v. Hillebrand*, 349 P.3d 1283, 1285 (Kan. Ct. App. 2015) (collecting cases demonstrating that shock, weight gain, guilt, nightmares, depression, headaches, nausea, crying, shaking, stress, anxiety, lack of sleep, general fatigue, PTSD, insomnia, and nightmares do not count unless accompanied by tangible physical injuries).

Carriker alleges no health problems at all. And Johnson's allegations show neither substantially simultaneous injury nor the sort of qualifying injuries that satisfy the standard for negligent infliction of emotional distress under Kansas law. Johnson's symptoms include headaches, vomiting, hives, and nausea. Doc. 1 at ¶ 11. As a matter of Kansas law, these are insufficient because they are generalized manifestations of emotional distress that are largely transitory. *See Majors*, 349 P.3d at 1285 (headaches); *Ware*, 180 P.3d at 615 (vomiting); Restatement (Second) of Torts § 436A (hives and nausea). And Johnson does not specify what date her physical manifestations began or how long they lasted. Doc. 1 at ¶ 11. This fails to carry her burden to plead that they were "substantially simultaneous" with the destruction of her property. *See Ware ex rel. Ware*, 180 P.3d at 615.

Plaintiffs say the allegations are sufficient because they describe "physical manifestations" of trauma. Doc. 12 at 14 (citing *Lovitt v. Bd. of Cnty. Comm'rs of Shawnee Cnty.* (Kan. Ct. App. 2009)). But physical manifestations of emotional trauma, standing alone, are not enough. Plaintiffs must allege substantially simultaneous qualifying physical injury. They do not—nor could they, since the defendants allegedly destroyed Johnson's property before she discovered that she would

19

not get it back. *Lovitt* does not rescue Plaintiffs' position. It only demonstrates that a plaintiff may suffer an emotionally traumatic situation and yet fail to state a claim for negligent infliction of emotional distress. *See Lovitt v. Bd. of Cnty. Comm'rs of Shawnee Cnty.*, 221 P.3d 107, 114 (Kan. Ct. App. 2009) (denying a claim for negligent infliction of emotional distress where 911 responders ignored a call they thought was a prank leading to PTSD and "anxious mood" for the caller).

### III

For the foregoing reasons, Defendants' Motion to Dismiss, Doc. 9, is GRANTED in part and DENIED in part.

It is so ordered.


Date: February 7, 2024              \_s/ Toby Crouse_____
                                    Toby Crouse
                                    United States District Judge